UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number:  09-60428-CIV-MARTINEZ-BROWN**

COAST CITRUS DISTRIBUTORS, INC. d/b/a
COAST TROPICAL,

       Plaintiff,

vs.

M/V CSAV HAMBURGO, her engines, boilers,
tackle, furniture, etc., COMPANIA SUD
AMERICANA DE VAPORES, S.A., M/V
LIBRA SANTA CATARINA, her engines
boilers, and LCL SWEDEN AB,

       Defendants.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS CAUSE came before the Court upon a bench trial held on June 1, June 2, June 3, and June 7, 2010, and upon the parties' post-trial briefs (D.E. No. 82, 84).  Plaintiff, Coast Citrus Distributors, Inc., doing business as Coast Tropical ("Coast Citrus"), brought the instant action pursuant to the Carriage of Goods at Sea Act ("COGSA"), 46 U.S.C. § 30701 *et seq*., alleging that Defendants Compania Sid Americana De Vapores, S.A. ("CSAV"), M/V CSAV Hamburgo, M/V Libra Santa Catarina, and LCL Sweden AB ("LCL"), breached their duty of care regarding five refrigerated containers of mangoes belonging to the Plaintiff.  Having duly considered all the evidence and arguments, the Court finds for Plaintiff and against Defendants.

FINDINGS OF FACT[1]

**A.      Booking and Transport of the Mangoes**

1.  Plaintiff, Coast Citrus was an experienced consignee of perishable goods shipped by ocean carriage. (Ana Ramos Dep. 15.)

2.  Coast Citrus is a nationwide distributor of mangoes which sells fruit across the United States and was licensed with the USDA in 2008.  (Tr. 136.)

3.  In 2008, Coast Citrus had been working with the Peruvian shippers of the mangoes at issue, C.C. Tropicales Sociedad Anonima Cerrada (C.C. Tropicales) between three and four years and with Frutos Olmos Peru S.A.C. ("Frutos") for approximately ten years. (Tr. 137.)

4.  On or about February 20, 2008, CC Tropicales made a booking with CSAV, through CSAV's agent, Consorcio Naviero Peruano S.A. ("Consorcio"), to ship one (1) 40' refrigerated container ("reefer") containing cargo of mangoes from Paita, Peru, to Port Everglades, Florida, and Consorcio issued Booking Confirmation no. 24A0052142 for this shipment which was to include container CRLU1261801. (Def. Exh. D); (Pl. Exh. 6-1).

5.  On or about February 27, 2008, Broom Peru S.A.C. ("Broom") made a booking with CSAV, through Consorcio, to ship one (1) 40' refrigerated container containing cargo of mangoes from Paita, Peru, to Port Everglades, Florida, and Consorcio issued Booking Confirmation no. 24A0052172 for this shipment which was to include container LNXU7559053. (Tr. 256); (Def. Exh. A); (Pl. Exh. 6-3).

6.  On or about February 28, 2008, Frutos made a booking with CSAV, through Consorcio, to

---

[1] To the extent that the Findings of Fact are more properly characterized as Conclusions of Law, and vice versa, the undersigned intends that they be considered as such.

ship two (2) 40' refrigerated containers containing cargo of mangoes from Paita, Peru, to Port Everglades, Florida, and Consorcio issued Booking Confirmation no. 24A0052425 for this shipment which was to include containers CRLU7220271 and GESU9178467. (Tr. 265); (Def. Exh. B); (Pl. Exh. 6-7, 6-8).

7.  On or about February 29, 2008, Frutos made a booking with CSAV, through CSAV's agent, Consorcio, to ship two (2) 40' refrigerated containers containing cargo of mangoes from Paita, Peru, to Port Everglades, Florida, and Consorcio issued Booking Confirmation no. 24A0052457 for this shipment which was to include container LNXU7554560. (Tr. 269); (Def. Exh. C); (Pl. Exh. 6-9).

8.  Ransa is a Peruvian company acting as a terminal operator for CSAV, a logistical operator for shippers, and acting as a customs agent.  (Tr. 254.)

9.  On or about February 24, 2008, Ransa received containers CRLU7220271 and LNXU7559053 at Port of Paita in a sealed condition.  (Tr. 161, 273, 300-303.)

10.  On or about February 26, 2008, Ransa received containers GESU9178467 and CRLU1261801 at Port of Paita in a sealed condition.  (Tr. 161, 273, 300-303.)

11.  On or about March 4, 2008, Ransa received containers LNXU7554560 at Port of Paita in a sealed condition.  (Tr. 161, 273, 300-303.)

12.  CSAV's agent, Consorcio Naviero Peruano S.A., originally issued booking confirmations for containers CRLU7220271, GESU9178467, CRLU1261801, and LNXU755905 for transit aboard the M/V Rio Tolten scheduled to depart on February 26, 2008.  (Tr. 207.)

13.  When the M/V Rio Tolten departed the Port of Paita, Peru on or about February 26, 2008, it is undisputed that those four containers were not on board.

14.  On February 27, 2008, CSAV's general agent in Peru, Consorcio Naviero Peruano S.A., sent an email to CC Tropicales saying that due to "operational problems" 100 containers were not loaded on the M/V Rio Tolten.  (Pl. Exh. 6-5.)  The email stated that two of those containers were CC Tropicales containers.  *Id.*  It also attached booking information stating that those containers would be booked on the next vessel, the M/V Libra Santa Catarina[2], which was scheduled to depart from the Port in Paita, Peru on March 4, 2008.  *Id.*

15.  On the other hand, testimony was given that three containers, CRLU7220271, CRLU1261801, and GESU91778467, were not onboard the M/V Rio Tolten because the shippers had failed to provide Ransa with the necessary documentation to load three of the containers onto the vessel. (Tr. 322-23.)  Consortio's agent admitted, however, that he had no idea why the fourth container did not ship on the M/V Rio Tolten.  (Tr. 331)  There was testimony that there was room on the ship for all three containers.  (Tr. 270.)

16.  Shippers were informed that cargo and customs documentation had to be ready a maximum of 24 hours before the ship's arrival.  (Pl. Exh. 6-7.)

17.  Because the evidence established that two of the four containers originally scheduled for M/V Rio Tolten did not arrive until February 26, 2008, the day the ship was supposed to sail, the Court finds that those two containers, GESU9178467 and CRLU1261801, did not ship on the M/V Rio Tolten because of the shipper's failure to have the cargo and customs documentation ready at least 24 hours before the arrival of the ship.  Based on the email, Pl. Exh. 6-5, and the testimony admitting that at least one container had its required documentation, the Court finds that the other two containers originally scheduled for M/V Rio Tolten, CRLU7220271 and

---

[2] Elsewhere in the record, this vessel is referred to as the M/V Santa Catarina.

LNXU7559053, did not ship because of the carrier's unspecified "operational problems."

18.  C.C. Tropicales and Frutos were informed that the four containers would be placed on the next vessel departing Paita, which was the M/V Santa Catarina, set to arrive in Paita between March 3 and March 4, 2008.  (Obos Dep. 12); (Guevara Dep. 15-16).

19.  CSAV issued the following bills of lading for the five subject containers of mangoes for transit on the M/V Santa Catarina on voyage number 08205-N:

| CONTAINER | BILL OF LADING | DESCRIPTION | CONSIGNEE |
|---|---|---|---|
| CRLU7220271 | CHIW25A011934 | 5544 BOXES 22 PALLETS WITH FRESH MANGO (MANGO FRESCO) | COAST |
| LNXU7554560 | CHIW25A011922 | 5544 BOXES IN 22 PALLETS WITH FRESH MANGO (MANGO FRESCO) | COAST |
| GESU9178467 | CHIW25A011933 | 5544 BOXES IN 22 PALLETS WITH FRESH MANGO (MANGO FRESCO) | COAST |
| CRLU1261801 | CHIW25A011866 | 5544 BOXES IN 22 PALLETS WITH MANGO FRESCO - FRESH MANGO | COAST |
| LNXU7559053 | CHIW25A011869 | 5544 BOXES IN 22 PALLETS CONTAINING FRESH MANGOES | COAST |

Pl. Exh. 10.

20.  When the bills of lading were issued, they stated: CARRIER'S OBLIGATION IS LIMITED ONLY TO MAINTAIN THE SETTING AIR TEMPERATURE OF 7 DEGREES CELSIUS[3] AS PER SHIPPERS/RECEIVERS WRITTEN INSTRUCTION, CONDITION AND QUALITY OF

---

[3] The instructions for container LNXU7554560 required that the temperature be set to 8 degrees Celsius.  (Def. Exh. R.)

CARGO UNKNOWN.  (Def. Exh. R, S, Q, T, N.)  Bill of lading CHIW25A011869 required that

the humidity not exceed 75% and that the special wooden packing material be treated according

to USDA specifications.  (Def. Exh. N.)

21.  Plaintiff Coast Citrus paid the freight and was party to all five bills of lading as the

consignee.  (Tr. 145.)

22.  Clause 2 of CSAV's Bill of Lading states in pertinent part:

> 2. CLAUSE PARAMOUNT:- ... (2) Notwithstanding Clause 2(1) above for shipments to
> and from the United States, this Bill of Lading shall be deemed to incorporate and shall
> have effect, subject to the provisions of the United States Carriage of Goods by Sea Act
> ("COGSA") approved April 16, 1936 and nothing herein nor contained in the said Act
> shall be deemed a surrender by the Carrier of any of its rights or immunities or an
> increase of any of its responsibilities thereunder, nor shall the Carrier be deemed to have
> warranted the seaworthiness of the Vessel. The provisions stated in COGSA shall govern
> the Goods before they are loaded on and after they are discharged from the Vessel and
> throughout the entire time that they are in the custody of the Carrier at a United States
> port. The Carrier shall also have the benefits of Sections 181 to 189, inclusive of title 46
> US Code and the benefits of Sections 4281 to 4286 inclusive and Section 4289 of the
> United States Revised Statutes, as amended, the same as if it were the owner of the
> Vessel or other water craft used to transport the Goods.

(Def. Exh. U).

23.  Clause 4 to the bills of lading at issue provides:

> The scope of the voyage herein contracted for shall include usual or customary or
> advertised ports of call whether named in this contract or not, ports in or out of the
> advertised, geographical, usual or ordinary route or order, even though in proceeding
> thereto the Vessel may sail beyond the Port of Discharge or in a direction contrary
> thereto, or depart from the direct or customary route.  The vessel may . . . omit calling at
> any port or ports more than once. . . .  Anything done in accordance with this Clause . . .
> or any delay arising therefrom shall be deemed to be within the scope of the voyage
> herein and shall not be a deviation.

(Def. Exh. U).

24.  Clause 8 of CSAV's Bill of Lading states:

> 8. LIBERTIES: - The Carrier may at any time and without notice to the Merchant use or substitute any means of carriage whatsoever and/or transfer and/or forward the Goods by any means and from one conveyance to another including (without limitation) transshipping or carrying the Goods in whole or in part on another vessel (or vessels) than the Vessel or Vessels named overleaf, whether operated by the Carrier or others and/or load, unpack, unload or transfer the Goods at the original Port of Loading or at any port or place (whether or not such port or place is named overleaf) and store the Goods at any such port or place. Any and all rights and exemptions accorded to the Vessel or Vessels named in this Bill of Lading shall likewise apply to any conveyances mentioned in this clause.  In any situation whatsoever, including but not limited to political disturbances, strikes or work stoppages or closures or blockages of waterways, which in the judgment of the Carrier or Master is likely to give rise to risk of capture, seizure, detention, damage, delay or disadvantage to the Vessel, Goods and/or those on board, the Carrier or Master shall in addition to the other rights contained in this Bill of Lading have the right to stop or delay the Vessel, awaiting the removal of any such hindrance or obstruction, or to return the Goods to the Port of Lading or to proceed via any other route or to transfer the Goods to craft off shore and/or forward them by any means of conveyance to destination all at the risk of expense of the Merchant. All storage charges in connection therewith, as well as all costs and expenses of forwarding and/or relaying shall be for the account of the Merchant and shall constitute a lien of the Goods.

(Tr. 407); (Def. Exh. U).

25.  Clause 11 of CSAV's Bill of Lading states in pertinent part:

> 11. DESCRIPTION, MARKINGS, WEIGHTS AND MERCHANT'S RESPONSIBILITY:- Unless otherwise stated herein, the description of the Goods and the particulars of the packages mentioned herein are those furnished by the Merchant and the Carrier shall not be responsible as to the correctness of the marks, numbers, quantity, weight, gauge measurement, contents, nature, quality or value. The Merchant shall be liable for any payment of whatsoever nature levied upon the Carrier or for transshipment expense for or in connection with the Goods and also for any payment or loss or damage of whatsoever nature (including without limitation fines and expenses) howsoever sustained or incurred by the Carrier in consequence of incorrect or insufficient marking, numbering, or addressing of packages or description of their contents, or for failure of the Merchant to procure all certificates to accompany the Goods, or to comply with regulations of any kind whatsoever imposed with respect to the Goods by authorities at the Ports and/or Places of loading transshipment, Discharge or Delivery. The Merchant shall indemnify the Carrier against all payments, fines, expenses or losses arising or resulting from any cause whatsoever in connection with the Goods for which the Carrier is not responsible. In no event shall the Carrier be liable for loss or damage to any

contents not specified on the face hereof. . . .  With respect to the Goods shipped in containers whether or not furnished by the Carrier, the Carrier shall not be responsible for the safe and proper packing, stuffing or stowing of Goods in containers when done by the Merchant, shipper consolidator or others on their behalf and no responsibility shall attach to the Carrier for any loss or damage caused to the contents by shifting, overloading or improper packing, stuffing or stowing of such container. The loading of such container(s) by the Merchant, shipper, consolidator or others on their behalf shall be prima facie evidence that the container(s) were sound and suitable for use and the Merchant agrees that he will return the Carrier's container(s) in the same condition as received. Any loss, damage or contamination to the container and equipment while in the possession of the Merchant is for the account of the Merchant, including the cost of cleaning or washing of a container returned in an unclean condition. Such container(s) shall be property sealed before shipment and the seal reference and identification references of th container(s) shall be shown on the face of this Bill of Lading.  The Merchant agrees to be responsible for any damage, loss, delay or expense whatsoever to the Vessel container(s), other property or to persons resulting from any defect in the Goods, shipper's packaging, securing and containerization.  The Merchant and their agents warrant no illegal Goods or unmanifested or improperly described Goods will be shipped and that they are in compliance with terms of the United States Customs Carrier Initiative agreement and that the Merchant and their agents will be responsible and hold the Carrier harmless for any lines, penalties, expenses, detentions, demurrage, arrest, attachments and other consequences arising out of the Carriage of unmanifested , illegal or misdescribed Goods including but not limited to drugs.

(Tr. 407-408); (Def. Exh. U).

26.  Clause 12 of CSAV's Bill of Lading states:

12. SPECIAL, CONTAINERIZED AND PERISHABLE GOODS: REFRIGERATION:- The Carrier shall have the right to carry fruits, vegetables, meals and any Goods of a perishable or special nature in ordinary compartments, ordinary dry cargo containers or on deck and without special cooling, heating or ventilation facilities or attention unless there is noted on this Bill of Lading a typewritten provision on the face thereof that the Goods will be carried in refrigerated or heated or ventilated spaces or containers. The Merchant undertakes not to tender for transportation Goods which require refrigeration, ventilation, heating and the like without giving prior written notice of their nature prior to receipt by the Carrier with specific instructions as to temperature, ventilation, heating and the like. Unless a special agreement is made and inserted in this Bill of Lading the Carrier does not undertake and shall not be liable for failure to give the Goods, whether or not of a perishable or special nature, any unusual or special care, handling, storage or facilities not given ordinary nonperishable, general Goods, nor will it discharge or deliver the Goods into or to any refrigerated, chilled, cooled, ventilated, insulated, heated, drained, dry, moist, or specially equipped place, compartment, container or other facility, and the

Merchant represents and warrants the Goods do not require any such special care or facilities. If perishable Goods requiring special temperature are delivered to the Carrier in a refrigerated container, the Merchant undertakes that the Goods have the temperature provided on the face hereof and that they have been properly stowed and the thermostatic controls have been properly set by him before delivery of the Goods to the Carrier. The Merchant agrees that when a temperature is noted on the face hereof or if not noted and the ambient temperature for the carriage of the perishable commodity is known or recognized for ocean transportation of said perishable commodity, the Carrier will exercise reasonable care to maintain the ambient temperature in the refrigerated chamber or container plus or minus 2ºC. In no event shall the Carrier be liable in any respect because heating, refrigeration or special cooling facilities are not furnished during loading, discharge or any part of the time that the Goods are on a dock, wharf, craft, or other loading or discharging place, and the Carrier does not undertake to furnish such facilities. The Carrier shall be under no responsibility whatsoever for loss or and/or damage to Goods arising out of defect, malfunction or irregularity of a container (whether a Merchant supplied container or not) unless such loss and/or damage arises out of causes for which the Carrier would otherwise be liable under this Bill of Lading.

(Tr. 408); (Def. Exh. U).

27. Clause 16 of CSAV's Bill of Lading states in pertinent part:

16. VALUATION:- If COGSA applies, neither the Carrier nor the vessel shall in any event be or become liable for any loss or damage to or in connection with the transportation of Goods in an amount exceeding $500 per package lawful money of the United States, or in the case Goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of the Goods have been declared by the shipper before shipment and inserted on the face of this Bill of Lading in the box SHIPPERS DECLARED VALUE and extra freight charges paid. Charges for excess value declaration shall apply as per Carrier's tariff. . . . In no event shall the Carrier be liable for more than loss or damage actually sustained. The Carrier shall not be liable for delay or for any consequential or special damages and shall have the option of replacing any lost Goods and/or replacing or repairing any damaged Goods.

(Tr. 408, lns. 10-12) (Def. Exh. U).

28. Clause 25 of CSAV's Bill of Lading states:

25. FINAL AGREEMENT:- All agreements or freight engagements for the shipment of the Goods are superseded by this Bill of Lading and all its terms, whether written, typed, stamped, or printed are accepted and agreed to by the Merchant to be binding as fully as if signed by the Merchant any local customer privileges to the contrary notwithstanding. Nothing in this Bill of Lading shall operate to limit or deprive the Carrier of any statutory

protection or exemption from or limitation of liability. This Bill of Lading is in no sense the personal contract of the Carrier. If required by the carrier one original signed Bill of Lading duly endorsed must be surrendered to the Carrier or its agent at the Port of Discharge or Place of Final Delivery in exchange for delivery order.

(Tr. 408); (Def. Exh. U).

29.  In February and March of 2008 CSAV did not provide a direct service from Paita, Peru, to the eastern seaboard of the United States. (Tr. 409.)

30.  Each of the five (5) bills of lading issued by CSAV also list the "Libra Santa Catarina" as the feeder vessel. (Def. Exh. N, Q, R, S, and T).

31. All five of the subject containers were loaded aboard the M/V Santa Catarina, which departed the Port of Paita on or about March 5, 2008. (Tr. 303-308); (Def. Exh. V). The containers were loaded on board by a local stevedore company, Tramarsa. (Tr. 254, 289.)

32. Container LNXU7554560 was to be transshipped through the Port of Guayaquil, Ecuador, meaning that it would be and was discharged from the M/V Santa Catarina at Guayaquil, Ecuador, and then loaded onto another vessel bound for ports in the U.S. (Tr. 396-97); (Def. Exh. P).

33. Containers CRLU7220271, GESU9178467, CRLU1261801, and LNXU7559053 were to be transshipped through the Port of Cartagena, Colombia. (Tr. 395); (Def. Exh. P).

34.  Containers CRLU7220271, GESU9178467, CRLU1261801, and LNXU7559053 were discharged from the M/V Santa Catarina at the Port of Cartagena, Colombia, on or about March 6, 2008. (Pl. Exh. 11.)

35.  The M/V CSAV Hamburgo was time chartered by CSAV and operated under a vessel sharing agreement ("VSA") with two (2) other ocean carriers. (Tr. 412, 451.)

36. All five containers were to be transshipped onto the M/V CSAV Hamburgo on voyage 082-N (the M/V Hamburgo made calls at both the Port of Guayaquil and Cartagena), and off-loaded at Port Everglades, FL, with an estimated time of arrival of March 21, 2008, according to CSAV's Arrival Notice dated March 17, 2008.

37. On or about March 17, 2008, CSAV learned from the vessel owners that the M/V CSAV Hamburgo which was en route to Cartagena, Colombia had suffered an engine failure and traffic congestion while in the Panama Canal. (Tr. 391, 454); (Def. Exh. HH).

38. The transit of the M/V CSAV Hamburgo was delayed through the Panama Canal four and one half (4½) days. (Tr. 392.)

39. On or about March 21, 2008, the M/V CSAV Hamburgo left the Port of Cartagena loaded with all five containers and bound for ports in the U.S. (Joint Pre-trial Stipulation, paragraph 4(qq)).

40. In order to be able to make up time lost due to engine trouble in the Panama Canal CSAV and its partners in the M/V CSAV Hamburgo vessel sharing agreement made the decision to alter the course of the M/V CSAV Hamburgo.  M/V CSAV Hamburgo was originally scheduled to stop at Port Everglades on the northbound leg of its voyage, then at Port Elizabeth, New Jersey, and then again at Port Everglades on the southbound leg from Port Elizabeth.  Instead, they decided to skip the northbound stop at Port Everglades, to go straight on to Port Elizabeth, and then to call at Port Everglades on the southbound leg from Port Elizabeth. (Tr. 435, 453-54); (Def. Exh. HH).  There were more refrigerated containers and more perishable cargo going to New Jersey than to Florida.  (Tr. 405.)

41. On March 24, 2008, CSAV issued amended Arrival Notices indicating that the five

-11-

containers were now estimated to arrive at Port Everglades on March 30, 2008.

42.  On March 31, 2008 the M/V CSAV Hamburgo arrived at Port Everglades, and the five

containers were offloaded. (Joint Pre-trial Stipulation, paragraph 4(rr)).

43.  On April 1, 2008, the five containers were made available to COAST at its warehouse in

Princeton, Florida.

44.  Coast Citrus was aware that it took between ten (10) to twelve (12) days for mangoes

shipped from Peru to arrive in the United States. (Tr. 136).

45.  Perishable Specialists, which tracked the progress of the five containers, could have cleared

the five containers at Port Elizabeth, New Jersey, if Coast Citrus had consented to do so. (Tr.

181-82, 193); (Ana Ramos Dep. 80).  Perishable Specialists determined, however, that it was a

bad business decision.  Their reasons were that they had their buyers in Florida, unloading the

cargo in New Jersey would mean that they would have to find and pay for a facility in Port

Elizabeth to unload the cargo and inspect it, and they had suffered previous bad experiences

trying to unload and sell their cargo in New Jersey.  (Tr. 181, 193.)

**B.    Quality of the Mangoes**

46.  Lina Salazar Guevarra testified that she worked for Frutos in Peru as the head of packing and

quality control, and that she had studied international trade at a university, and that she was at the

packing plant when container numbers CRLU7220271, GESU9178467, and LNXU7554560,

were packed with fresh mangoes to be shipped to Plaintiff in Florida, and that she personally saw

the mangoes being loaded, and the quality was good.

47.  Rocio Anhel Mayta Obos testified that she works for CC Tropicales in Peru, and that she

was in charge of logistics, exports, documentation, export documents, at the time it handled the

mangoes that were to be shipped to COAST in Florida in containers numbers LNXU7559053 and CRLU1261801, and that she knew the condition of the mangoes, and they were qualified for export.

48.  Victor Montero Rivas testified that he also works for CC Tropicales in Peru, and that he has university studies and training as an agro picarian technician and as an engineer related to hygiene and sanitation in vegetables, and that he saw the subject pallets being loaded into container numbers LNXU7559053 and CRLU1261801 which were to be shipped to COAST in Florida, and that he believed that all the mangoes were of excellent, optimal quality.

49.  Maria Carmen Juarez Navarro testified that she works for Distribuidora International Ago Industrial, SAC, which was the packing house in Peru where the subject mangoes from CC Tropicales and Frutos were packed into the five containers, and that she had studied agro industrial engineering from the Universidad Nacional de Piura in Peru for five years and received a degree in it, and that she personally saw the quality of the mangoes packed into the five containers to be shipped to COAST, and the quality was good.

50.  The USDA Animal and Plant Health Inspection Service operating in Peru issued Aphis Hot Water treatment certificates 370, 371, 376, 377, and 390 for the subject five containers. (Pl. Exh. 4-1 – 4-5.)

51.  Hot water treatment is a requirement of the U.S. Government for APHIS fly eradication. (Tr. 74, 469); (Isabel Freeland Dep. 26).

52.  The hot water treatment performed on these containers was done before the mangoes were loaded inside the container by or on behalf of the five shippers, and before CSAV ever received the containers at the Port of Paita, Peru. (Tr. 73, 173.)

53.  The shipments of mangoes were loaded by the shipper or its agents into reefer containers

supplied by the Defendant or its agent.  It is undisputed that neither CSAV nor any of its agents

packed or stuffed any cargo in containers CRLU7220271, LNXU7559053, GESU9178467,

CRLU1261801, and LNXU7554560.  The bills of lading for all five containers reflected this,

stating that the containers were "SHIPPERS STOW, LOAD, COUNT AND SEALED."

54.  The recommended transportation time for mangoes is fourteen (14) days with a maximum

shelf life of twenty-eight (28) days. (Tr. 44.)

55. Shelf life is the amount of time that the mangoes are expected to be in marketable condition.

(Tr. 75.) The shelf life starts to run the minute a fruit is cut from the tree. (Tr. 76.)  It takes two or

three days from the day the fruit is picked for it to be packed into the container.  (Maria Navarro

Dep. 41); (Victor Rivas Dep. 14); (Rocio Obos Dep. 18).  Therefore, the Court find that the

mangoes in containers CRLU7220271 and LNXU7559053 were picked on or before February

22, 2008; the mangoes in containers GESU9178467 and CRLU1261801 were picked on or

before February 24, 2008; and the mangoes in container LNXU7554560 were picked on or

before March 2, 2008.  That means that the shelf life for mangoes in containers CRLU7220271

and LNXU7559053 ran through March 21, 2008 at the latest; the shelf life for mangoes in

containers GESU9178467 and CRLU1261801 ran through March 23, 2008 at the latest; and the

shelf life for mangoes in container LNXU7554560 ran through March 30, 2008 at the latest.

56.  On or about April 3, 2008, COAST hired Alpha Marine Surveyors to inspect the

five containers. On April 4, 2008, Roland Santos inspected the five containers, and he wrote up

five survey reports. Each survey report concluded that the mangos had lost their shelf life as a

result of exceeding the USDA's estimated maximum storage life. (Pl. Exh. 14.)  The surveys cost

$433.50 per containers.  (Pl. Exh. 14.)

57.  With respect to the mangoes loaded inside container no. LNXU7559053, on or about April 4, 2008, Plaintiff's surveyor, Roland Santos of Alpha Marine Surveyors, inspected the mangoes and found that 100% of the fruit was in firm ripe condition and that at least 14% had suffered hot water treatment damage.  He found no mold.  (Pl. Exh. 14); (Def. Exh. SSS).

58.  With respect to the mangoes loaded inside container no. GESU9178467, on or about April 4, 2008, Roland Santos of Alpha Marine Surveyors inspected the mangoes and found that at least 11% had suffered hot water treatment damage.  His report stated that he found no mold.  However, during trial he testified that black spots on the mangoes in that container were the result of anthracnose, a naturally occurring fungus that appears on very ripe mangoes.  (Tr. 81); (Pl. Exh. 14); (Def. Exh. RRR).

59.  With respect to the mangoes loaded inside container no. CRLU7220271, on or about April 4, 2008, Roland Santos of Alpha Marine Surveyors inspected the mangoes and found that one mango had suffered hot water treatment damage.  (Pl. Exh. 14.)

60.  With respect to the mangoes loaded inside container no. CRLU1261801, on or about April 4, 2008, Roland Santos of Alpha Marine Surveyors inspected the mangoes and found that at least 12.5% had suffered hot water treatment damage.  He also found that 2% were bruised.  (Pl. Exh. 14.)  Bruising may be the result of packing errors, but the odds of bruising increase greatly as the fruit becomes ripe.  (Tr. 174.)

61.  Mangoes with more than 10% defects, including 10% hot water damage, do not meet USDA Grade 1 standards.  (Tr. 97, 466.)  However, some of Coast Citrus's customers had a 15% hot water treatment damage delivery standard. (Tr. 141.)  Nevertheless, an excessive amount of hot

water treatment damage would effect the saleability of a mango. (Tr. 140.)  Coast Citrus has the

ability to repack the mangoes to eliminate those with hot water damage to improve saleability

again, however.  (Tr. 141-42.)

62.  The Court finds that the hot water damage to the mangoes preexisted the shipping delay.

### C.      Payment for the Mangoes and Damages

63.  For the mangoes in container LNXU 7559053, Coast Citrus did not pay the invoice price to

the shipper C.C. Tropicales. (Isabel Freeland Dep. 47.)  For the mangoes in container

CRLU1261801, Coast Citrus did not pay the invoice price to C.C. Tropicales, the shipper. (Isabel

Freeland Dep. 106.)  Freeland also testified that a buyer, such as Coast Citrus, is entitled to file a

claim against the grower pursuant to PACA if the product is not in the agreed condition.

Freeland did not, however, deny that Coast Citrus was the buyer or the owner of that fruit.

Rather, her testimony established that she thought Coast Citrus might have an avenue to pursue

damages against other parties in addition to the Defendants in this case.  (Isabel Freeland Dep.

107, 109.)

64.  Coast Citrus bought the mangoes shipped by Frutos, containers CRLU7220271,

LNXU7554560, and GESU91778467, on consignment and has not payed the growers for those

shipments.  (Tr. 172-73.)  However, Coast Citrus's representative denied that they had a pending

Perishable Agricultural Commodities Act ("PACA") claim regarding the ownership of those

three containers; rather, the representative asserted that Coast Citrus was not disputing with the

grower that Coast Citrus owned the mangoes.  (Tr. 172.)

65.  Frutos was never paid for the mangoes it delivered to Coast Citrus.  (Guevara Dep. 27-28.)

However, the mangoes were shipped F.O.B., or free on board, which meant that exporter was

responsible for the cargo only until the cargo was on board the carrier.  (Guevara Dep. 29.)

66.  The USDA Market New Report prices for mangoes in Miami in March 2008 are $5.00 for

one-layer flats of size 7, 8, and 9 mangoes and $6.00 for one-layer flats of sizes 10 and higher.

(Pl. Exh. 16.)  This report does not mention the USDA grade of the mangoes.  *Id*.

67.  The Court notes that some of the evidence is somewhat inconsistent regarding the sizes of

the mangoes in the boxes. S*ee* Pl. Exh. 14 (Alpha Marine Surveyors' reports stating variously

that the mangoes were all size 12 and that they varied between sizes 7 and 14).  Based on the

evidence before it, the Court nevertheless makes the following findings regarding the sizes of the

boxes of mangoes at issue:

| CONTAINER | BOXES OF SIZE 7, 8, 9 | BOXES OF SIZE 10, 12, 14 |
|---|---|---|
| CRLU7220271 | 3,780 | 1,764 |
| LNXU7554560 | 1,764 | 3,780 |
| GESU9178467 | 3,169 | 2,375 |
| CRLU1261801 | 3,276 | 2,268 |
| LNXU7559053 | 4,536 | 1,008 |

*See* (Pl. Exh. 15) (providing sizes for the mangoes).

68. For container no. CRLU7220271, Coast Citrus received a total amount of $5,854.00 for the

mangos in that container. (Tr. 153.)

69. For container no. LNXU7554560, Coast Citrus received a total of $2,389.70 for the mangos

in that container. (Tr. 153.)

70. For container no. GESU9178467, Coast Citrus received a total amount of $1,607.00 for the

mangos in that container. (Tr. 153.)

71.  For container no. CRLU1261801, Coast Citrus received a total value of $72.00 for the

mangos in that container. (Tr. 153.)

72. For container no. LNXU7559053, Coast Citrus received a total amount of $1,347.00 for the

mangos in that container. (Tr. 153.)

CONCLUSIONS OF LAW

**A.**      **Party in Interest**

1.  "Admiralty cases, like any others, must be brought by a real party in interest." *Polo Ralph*

*Lauren, L.P. v. Tropical Shipping & Const. Co., Ltd.*, 215 F.3d 1217, 1223 n. 12 (11th Cir. 2000)

(citing Fed.R.Civ.P. 17(a); *Farbwerke Hoechst A.G. v. M/V "DON NICKY"*, 589 F.2d 795, 797

(5th Cir. 1979) ("The Federal Rules of Civil Procedure are fully applicable in admiralty cases.")).

"Depending on the circumstances of the underlying transaction, a proper admiralty plaintiff

might be the shipper or consignee named in the bill of lading, or the owner of the goods, with

consideration given to which party had a proprietary or financial stake in the lost or damaged

goods, and which party bore the risk of loss." *Polo Ralph Lauren*, 215 F.3d at 1223 n. 12.

2.  "[W]here a shipper delivers goods to a carrier for transportation to a consignee designated in

the contract of carriage as the person to whom the carrier is directed and authorized to deliver the

shipment at its destination, it will be presumed that title to or at least a beneficial interest in, the

goods passed to the consignee upon such delivery to the carrier and therefore that the consignee

has title or interest in the goods sufficient to enable such consignee to maintain an action against

the carrier for damage to the goods."  14 Am. Jur. 2d Carriers § 577 (Nov. 2010).  It is not

disputed that Plaintiff was the consignee for the five containers as that term is defined in

admiralty, that the mangoes were shipped F.O.B., and that no buyer in Port Everglades had yet

received ownership of the mangoes when they shipped.  Therefore, the evidence before the Court

-18-

supports the conclusion that the Plaintiff in this case is a party in interest with respect to the containers shipped on consignment.  Although there is evidence that Plaintiff had not at the time of trial paid for the fruit, no evidence was shown sufficient to rebut the presumption that Plaintiff owed the money for the fruit, having sold it, and bore the risk to the cargo during transport.

**B.     COGSA**

3.  COGSA and its predecessor, the Harter Act, were enacted in part to restrict the rampant use of exculpatory clauses in bills of lading, which were seen as a result of carriers' superior bargaining power. *Vision Air Flight Service, Inc. v. M/V National Pride*, 155 F.3d 1165, 1171 n. 7 (9th Cir. 1998); *Sun Oil Co. of Pennsylvania v. M/T Carisle*, 771 F.2d 805, 814 (3rd Cir. 1985).  COGSA has a "strong policy against lessening a carrier's liability and toward off-setting the historically superior bargaining power of carriers."  *PT Indonesia Epson Industry v. Orient Overseas Container Line, Inc*., 219 F.Supp.2d 1265, 1273 (S.D. Fla. 2002).

4.  COGSA governs "all contracts for carriage of goods by sea to or from ports of the United States in foreign trade." COGSA §13.  The phrase "carriage of goods" covers "the period of time from the time when the goods are loaded on to the time when they are discharged from the ship." COGSA § 1(e). However, COGSA permits agreements and stipulations relating to times "prior to loading" and "subsequent to the discharge from" the ship.  COGSA § 7.  In this case, Clause 2 of the bills of lading provides that COGSA shall govern during the entire period that CSAV had custody of the cargo, which is permitted under COGSA § 7.

5.  COGSA is a burden-shifting statute.  *Banana Services, Inc. v. M/V Fleetwave*, 911 F.2d 519 (11th Cir. 1990)*; Sony Magnetic Products Inc. of America v. Merivienti O/Y*, 863 F.2d 1537, 1539 (11th Cir. 1989) (citing *Terman Foods, Inc. v. Omega Lines*, 707 F.2d 1225, 1227 (11th

Cir. 1983)).

6.  Initially, the burden is on the Plaintiff to show "1) full delivery of the goods in good condition

to the carrier, and 2) outturn by the carrier of the cargo with damaged or missing goods."

*Plastique Tags, Inc. v. Asia Trans Line, Inc.*, 83 F.3d 1367 (11th Cir.1996).  At this stage, "the

plaintiff is not required to prove that the defendant was at fault or explain how the damage might

have occurred." *Channa Imports, Inc. v. Hyber, Ltd*., 07-21516-CIV, 2009 WL 1308910, at *6

(S.D. Fla. 2009) (quoting *Leather's Best Int'l, Inc. v. MV "Lloyd Sergipe"*, 760 F.Supp. 301, 308

(S.D.N.Y.1991)).

7.  Then the burden shifts back to Defendants "to prove that it exercised due diligence to prevent

damage, or that the damage was caused by one of the 'excepted causes'" in the statute.  *Banana*

*Services*, 911 F.2d at 521.

8.  "[T]he burden then shifts back to the shipper to show that the carrier's negligence was, at the

least, a concurrent cause of the loss."  *Sony Magnetic Products Inc. of America v. Merivienti O/Y*,

863 F.2d 1537, 1539 (11th Cir. 1989) (citing *Terman Foods, Inc. v. Omega Lines*, 707 F.2d

1225, 1227 (11th Cir. 1983)).

9.  Based on the Court's findings, Plaintiff has met its burden with respect to the prima facie

case.

**C.      Due Diligence and Excepted Causes**

10.  Normally, showing due diligence requires that a carrier show "it exercised due diligence to

prevent the damage by properly handling, stowing, and caring for the cargo in a seaworthy ship."

*Terman Foods, Inc. v. Omega Lines*, 707 F.2d 1225, 1227 (11th Cir. 1983) (citing COGSA §

3(1) and (2)).  In this case, where the parties have agreed to apply COGSA to the entire period

the cargo was in CSAV's custody, the Court will look to whether CSAV exercised due diligence to prevent the damage by properly handling, stowing, and caring for the cargo in its custody on or off the ship.

11.  Defendants have shown that they had space for the containers GESU9178467 and CRLU1261801 onboard the M/V Rio Tolten out of the Port of Paita.  They have shown that they exercised due diligence with respect to their failure to ship those containers on February 26, 2008, because they did not receive the necessary items, including the containers themselves, in time, despite informing the shippers of the need to do so.  Defendants have shown that those two containers suffered an eight-day delay leaving the Port of Paita, Peru due to Plaintiff's failure to provide the containers and their required documentation in time, resulting in the containers remaining at the Port of Paita until March 5, 2008.

12.  On the other hand, Defendants have not shown due diligence regarding their failure to ship containers CRLU7220271 and LNXU7559053 onboard the M/V Rio Tolten on February 26, 2008.[4]

13.  Section 8 of COGSA provides:

> Any clause, covenant, or agreement in a contract of carriage relieving the carrier or ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or

---

[4] The Court also considers the failure to ship the four containers originally scheduled for the M/V Rio Tolten on February 26, 2008 as a deviation.  *See Spartus Corp. v. S/S Yafo*, 590 F.2d 1310, 1313 (5th Cir. 1979) (defining a deviation as "any variation in the conduct of a ship in the carriage of goods whereby the risk incident to the shipment will be increased.") (quoting *G.W. Sheldon & Co. v. Hamburg Amerikanische Packetfahrt A.G.*, 28 F.2d 249, 251 (3d Cir. 1928)).  Therefore, the failure to ship containers CRLU7220271 and LNXU7559053 on the M/V Rio Tolten is an unreasonable deviation, but the failure to ship containers GESU9178467 and CRLU1261801 onboard the M/V Rio Tolten is a reasonable deviation.  *See* Conclusions ¶¶ 14-17.

lessening such liability otherwise than as provided in this chapter [this note], shall be null and void and of no effect.

COGSA §8, 46 U.S.C. § 30701 (brackets in original).  As discussed in this Court's Order Granting in part and Denying in part Motion for Reconsideration (D.E. No. 58), COGSA §8 voids the Clause 16 exculpatory clause regarding delay in this case because the goods in question are perishable. *See Sun Oil Co. of Pennsylvania v. M/T Carisle*, 771 F.2d 805, 815 (3rd Cir. 1985) (voiding a loss allowance under COGSA §8).  Defendants may, however, seek recourse on perishable goods through showing inherent vice, rather than through an exculpatory clause. *See id.*

14.  Section 4(4) of COGSA provides as follows:

> Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed an infringement of this chapter [this note] or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom: *Provided, however*, That if the deviation is for the purpose of loading or unloading cargo or passengers it shall, prima facie, be regarded as unreasonable.

COGSA §4(4), 46 U.S.C. § 30701 (emphasis, brackets, and capitalization in original).

15.  The burden of showing a "reasonable deviation" falls on Defendants.[5] *See Socony Mobil Oil*

------

[5] Defendants argue, first, that there was no deviation, and second, that if there was a deviation, the deviation was reasonable.  Defendants' argument that no deviation occurred is without merit for two reasons.  First, a deviation is "any variation in the conduct of a ship in the carriage of goods whereby the risk incident to the shipment will be increased." *Spartus Corp. v. S/S Yafo*, 590 F.2d 1310, 1313 (5th Cir. 1979) (quoting *G.W. Sheldon & Co. v. Hamburg Amerikanische Packetfahrt A.G.*, 28 F.2d 249, 251 (3d Cir. 1928)).  Cases more narrowly construing deviation do so in the context of attempts to nullify COGSA's limitation on liability.  Second, it does Defendants no good to argue that no deviation occurred in an effort to refute a COGSA prima facie case.  Defendants are relying on deviation cases decided in another context, namely a context where the doctrine of deviation is invoked in order to nullify the contract of carriage and escape COGSA limits on liability. *See Unimac Co. Inc. v. C.F. Ocean Service, Inc.*, 43 F.3d 1434 (11th Cir. 1995) (explaining that the doctrine of deviation is used by shippers to nullify the defenses in the contract of carriage and to make COGSA and its liability limitations inapplicable).  In this case, no one is trying to nullify the contract of carriage or to dispute

-22-

*Co. v. Texas Coastal & Intern'l, Inc.*, 559 F.2d 1008, 1013 (5th Cir. 1977)[6] ("[o]nce [plaintiff]

successfully demonstrated that the cargo was loaded in good condition, and discharged in

damaged condition, the burden was on the defendants to show that the cause of the damage was

one of the risks for which carriers are not liable."); *E. C. L. Sporting Goods v. U.S. Lines, Inc*.,

317 F.Supp. 1245, 1248 (D.C. Mass. 1969) (noting that even in the presence of a "liberties"

clause similar to Clause Four in this case, a carrier may only make reasonable deviations and the

burden is on the carrier to demonstrate such reasonableness); *see also Hellenic Lines, Ltd. v.

United States*, 512 F.2d 1196, 1203-04 (2d Cir. 1975) ("liberties clauses . . . have been strictly

construed, since a literal construction might permit virtually any deviation" and instead "they

excuse only those deviations which are reasonable.") (internal quotations omitted).

16.  As discussed above, the M/V CSAV Hamburgo skipped Port Everglades in order to save

time and unload cargo in Port Elizabeth, stopping in Port Everglades only once on the

southbound leg.  In terms of showing reasonableness for a deviation to unload cargo, "the carrier

ought not be allowed to deviate with no other motive than the increase of his own revenues; thus,

the proof required to overcome the [p]rima facie unreasonableness of such a deviation would

have to show something more than mere reasonableness from the point of view of the Carrier."

*Spartus Corp. v. S/S Yafo*, 590 F.2d 1310, 1314 (5th Cir. 1979) (quoting G. Gilmore & C. Black,

---

liability limitations.  An argument that a reasonable deviation caused the damage at issue would
refute the Plaintiff's prima facie case.  An argument that no deviation occurred at all, however, is
not an argument that will help Defendants, absent it being fleshed out into an argument regarding
due diligence.

    [6] This case is a former Fifth Circuit, Unit B case and because it was rendered before
September 30, 1981, it is binding precedent in this circuit. *See Stein v. Reynolds Sec., Inc.*, 667
F.2d 33, 34 (11th Cir.1982).

The Law of Admiralty 179 (2d ed. 1975)).  "The carrier, throughout the performance of the voyage, is always subject to (COGSA's) Section 3(2) duty to care for and carry the goods properly, and his decision on a route would seem to be improper and unreasonable whenever it is made in disregard of that duty."  *Id*. at 1314-15.  "The true test [of reasonable deviation] seems to be what departure from the contract voyage might a prudent person controlling the voyage at the time make and maintain, having in mind all the relevant circumstances existing at the time, including the terms of the contract and the interests of all parties concerned, but without obligation to consider the interests of any one as conclusive."  *American Cyanamid Co. v. Booth S.S. Co.*, 99 F.Supp. 232, 237 (D.C.N.Y. 1951).

17.  In this case, the relevant portion of Clause 4 provides that Defendants may arrive at "ports in or out of the advertised, geographical, usual or ordinary route or order, even though in proceeding thereto the Vessel may sail beyond the Port of Discharge . . . or depart from the direct or customary route."  Clause 4 also provides that the vessel "may . . . omit calling at any port or ports more than once. . . ."  In combination with the evidence showing that Defendants went to Port Elizabeth first because they had more perishable cargo bound for Port Elizabeth than for Port Everglades, this contract language suggests that Defendants' deviation was reasonable.  In deviating, Defendants did not disregard their duty to care for the goods and they considered the relevant circumstances, including the terms of the contract and the interests of all parties concerned.

18.  Another defense to liability under COGSA is inherent defect, quality, or vice of the goods.  COGSA § 4(2)(m).  In asserting this exception, "the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier

nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage."
COGSA § 4(2). Defendants have met their burden to show inherent vice in the mangoes with hot
water damage.

19. The Court notes, however, that with respect to the two containers that the shippers delivered
on time, CRLU7220271 and LNXU7559053, but that Defendants failed to ship out on the M/V
Rio Tolten because of "operational problems," the Court has already determined that Defendant
has not met its burden of showing due diligence or a reasonable deviation in that case. Showing
that a further deviation with taken respect to that cargo was reasonable will not serve to shift the
burden back to Plaintiff; this is particularly true when the Court has already determined that the
mangoes in containers CRLU7220271 and LNXU7559053 reached their maximum shelf life on
March 21, 2008, the same day that the M/V CSAV Hamburgo sailed from Cartagena. Therefore,
even if the M/V CSAV Hamburgo had sailed straight to Port Everglades from Cartagena, the
mangoes in containers CRLU7220271 and LNXU7559053 still would have arrived having
exceeded their maximum shelf life. Accordingly, Defendants are liable under COGSA for the
damage to the mangoes in containers CRLU7220271 and LNXU7559053.

**D.    Negligence as a Concurrent Cause of the Loss**

20. Because Defendants have met their burden with respect to hot water damage, the delay
shipping two late-delivered containers out of the Port of Paita, and the deviation involved in
bypassing Port Everglades on the northbound leg of the voyage, the burden "shifts back to
[Plaintiff] to show that the carrier's negligence was, at the least, a concurrent cause of the loss."
*Sony Magnetic Products Inc. of Am.*, 863 F.2d at 1539.

21. Under COGSA, the carrier has a duty to "properly and carefully load, handle, stow, carry,

keep, care for, and discharge the goods carried." COGSA § 3(2). In determining whether the

carrier's negligence was the concurrent cause of the loss, the Court "should determine what a

reasonably prudent carrier in the exercise of its § 3(2) duty should do. . . ." *United States v.*

*Lykes Bros. S. S. Co., Inc.*, 511 F.2d 218, 224 (5th Cir. 1975). The Plaintiff "is obligated to

prove, by a preponderance of the evidence, what damage was actually caused beyond that which

would have resulted from the defective condition existing in the [cargo] at the time of its

delivery." *Id.* at 225. "[T]he Court should keep in mind that Carrier's decision is to be reviewed

in light of the circumstances as they reasonably appeared at the time—not with the benefit of

hindsight." *Id.*

22. Plaintiff has not met that burden with respect to the hot water damage, which was a defective

condition that existed at the time of delivery.

23. With respect to the failure to ship containers GESU9178467 and CRLU1261801 from the

Port of Paita before March 5, 2008, Plaintiff has not pointed to any other action a reasonably

prudent carrier would have taken, having failed to receive the containers and the customs

paperwork in time. Plaintiff has not pointed to evidence of any vessels the containers could have

gone on earlier. Therefore, the Court will turn to the second deviation, which consisted of

bypassing Port Everglades.

24. As the Court discussed above, Defendants' § 3(2) duty required it to consider all of its cargo

in deciding whether to go to Port Everglades or Port Elizabeth first, particularly in light of the

fact that the bills of lading permitted Defendants to visit the ports in any sequence. Nevertheless,

the evidence before the Court shows that a reasonably prudent carrier could have decided to

bypass Port Everglades on the northbound leg and informed Plaintiff before March 24, 2008,

when the mangoes were already en route.  Plaintiff has not shown by a preponderance of the

evidence that the damages were caused by that delay in sending out Amended Notices, however.

Certainly, circumstantial evidence suggests that Plaintiff would not have found a different carrier,

because Plaintiff did not do so in Paita, and that Plaintiff would not have arranged to unload the

fruit in Port Elizabeth.  Accordingly, the Court finds that Plaintiff has not met its rebuttal burden

with respect to containers GESU9178467, CRLU1261801, and LNXU7554560.

### E.      Damages

25.  "Under COGSA, a carrier may limit its liability by providing clear language in its Bill of

Lading that it is adopting COGSA as governing law and that a '$500 per package' limitation

applies." *Garland Corp. v. Evergreen Marine Corp*., No. 08-61280, 2009 WL 1660311, at *3

(S.D. Fla. 2009) (citing *Insurance Co. of North America v. M/V Ocean Lynx*, 901 F.2d 934, 939

(11th Cir.1990)).  The carrier must also give the shipper the opportunity to declare a higher value

and pay a higher freight charge.  *Id*.  It is undisputed that the requisite language and the

opportunity to declare a higher value and pay a higher freight charge was present in this case.

Thus, limitation of liability applies.

26.  COGSA does not define "package."  *See* 46 U.S.C. § 30703(b).  The Eleventh Circuit has

adopted the Second Circuit's definition of package, which is "a class of cargo, irrespective of

size, shape or weight, to which some packaging preparation for transportation has been made

which facilitates handling, but which does not necessarily conceal or completely enclose the

goods." *Groupe Chegaray v. P & O Containers*, 251 F.3d 1359, 1368 (11th Cir. 2001) (quoting

*Aluminios Pozuelo, Ltd. v. S.S. Navigator*, 407 F.2d 152, 155 (2d Cir. 1968)).

27.  In determining what constitutes a package in a particular shipment, the Court applies the

following analysis:

> (1) when a bill of lading discloses the number of COGSA packages in a container, the liability limitation of section 4(5) applies to those packages; but (2) when a bill of lading lists the number of containers as the number of packages, and fails to disclose the number of COGSA packages within each container, the liability limitation of section 4(5) applies to the containers themselves."

*Hayes-Leger Associates v. M/V Oriental Knight*, 765 F.2d 1076, 1080 (11th Cir. 1985).

28. "[A]n ambiguity on a bill of lading regarding the number of COGSA packages should be resolved in favor of the shipper," *Sony Magnetic Prods. v. Merivienti O/Y*, 863 F.2d 1537, 1542 (11th Cir. 1989), but in construing the terms of the bills of lading, "[t]he court cannot make a new contract for the parties where they themselves have employed express and unambiguous words." *Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1454 (11th Cir. 1989).

29. Applying the above analysis, the Court concludes that the "packages" to which the limitation of liability apply are the 5544 boxes listed on the bills of lading.

30. Defendants have alleged that Plaintiff failed to mitigate its damages by inspecting and selling the fruit sooner and by finding better buyers, but Defendant has not introduced any evidence of the amount by which this would have reduced Plaintiff's damages.

31. It is undisputed in this case that the measure of damages are the fair market value of the mangoes less the value of the damaged goods plus incidental damages.

32. With respect to container CRLU7220271, there were 3,780 $5.00 boxes and 1,764 $6.00 boxes. Based on the evidence before this Court, container CRLU7220271's single hot-water damaged mango would not have altered the value of the cargo in any way. Therefore, the fair market value was $29,484. From this, the Court will deduct the $5,854 Plaintiff received for the damaged mangoes and add the $422.50 for the survey, for total damages of $24,052.50.

33. With respect to container LNXU7559053, there were 4,536 $5.00 boxes and 1,008 $6.00 boxes. Those mangoes had 14% hot water damage. The evidence showed that only up to 10% hot water damage would qualify as USDA Grade 1 mangoes, which Coast contracted for, so the Court will reduce the market value by 4% on the basis of the fact that Coast could repackage the mangoes until the shipment reached its standards, thus reducing the number of mangoes and their value by 4%. Therefore, the fair market value was $27,578.88. From this, the Court will deduct the $1,347 Plaintiff received for the damaged mangoes and add $422.50 for the survey, for total damages of $26,654.38. Therefore, the total damages for both containers is $50,706.88. Accordingly, it is

    **ORDERED AND ADJUDGED** that the Court finds for Plaintiff and against Defendants with respect to Plaintiff's COGSA claim, as provided above. Final Judgment shall be entered by separate order.

    DONE AND ORDERED in Chambers at Miami, Florida, this 22nd day of March, 2011.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE


Copies provided to:
Magistrate Judge Brown
All Counsel of Record